IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| **ADRIAN DESHUN DELK,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) Case No. 1:19-cv-00081 |
| v. | ) |
| | ) JUDGE CAMPBELL |
| **THELMA BUMPHUS, TREASA** | ) MAGISTRATE JUDGE HOLMES |
| **PETTY, and JASPER BREWSTER,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM

Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. No. 109). In support of the Motion, Defendants' filed a memorandum of law (Doc. No. 110) and statement of undisputed material facts (Doc. No. 111). Plaintiff filed a responded to the Motion (Doc. No. 113) and to the statement of undisputed material facts (Doc. No. 114).[1] Defendants filed a Reply. (Doc. No. 116). The Motion is ripe for review.

### I.     PROCEDURAL BACKGROUND

Plaintiff Adrian Deshun Delk filed his original complaint *pro se* in the Western District of Tennessee. *Adrian Deshun Delk v. Hardeman County Correctional Facility, et al.*, No. 1:16-cv-1275. (Doc. No. 1). The original complaint concerned an attack on Delk by inmates at Hardeman County Correctional Facility ("HCCF") on March 4, 2016, and allegations related to his subsequent medical treatment at South Central Correctional Facility ("SCCF"). *Id*. Following an initial review of the Complaint, the District Court for the Western District of Tennessee severed the claims involving Delk's medical care at SCCF and transferred that portion of the case to the Middle District of Tennessee. (Doc. No. 35). Subsequently, Delk retained counsel and

---

[1] For ease of reference Defendants' Statement of Undisputed Material Facts (Doc. No. 111) together with Plaintiff's Response (Doc. No. 114) will be cited as "SOF at ¶ __."

filed a Second Amended Complaint concerning only Delk's medical care at SCCF. (Doc. No. 63). In the Second Amended Complaint, Delk alleges three individual Defendants, nurses Thelma Bumphus and Treasa Petty, and dentist Jasper Brewster, provided constitutionally inadequate medical care for his broken jaw. Specifically, Delk contends that after being transported to SCCF, Defendants failed to (1) treat him for injury incurred during transport; (2) administer prescription mouthwash; (3) have wire cutters nearby; and (4) timely replace rubber bands in his mouth. (Doc. No. 63).

## II.     FACTUAL BACKGROUND

On March 4, 2016, Delk was assaulted by inmates at HCCF, resulting in a broken jaw and orbital fractures. (SOF ¶ 1). After the assault, Delk was transported to Regional One Health Medical Center ("Regional One") in Memphis, Tennessee, where his jaw and orbital fracture were surgically repaired, and his mouth was wired shut. (*Id*. ¶ 2). Delk was discharged from Regional One on March 10, 2016, and scheduled for a follow-up appointment on March 21, 2016 (*Id*. ¶¶ 3, 5). As part of his discharge instructions, Regional One prescribed Delk a Medrol dose pack, a Lortab elixir, and clindamycin, instructed him to use prescription mouthwash (chlorohexidine gluconate) every 12 hours, and to have wire cutters "within immediate distance in case of emergency." (*Id*. at ¶ 4 (citing Doc. No. 111-5 at PageID# 1082)). Due to HCCF's inability to house Delk in an inpatient environment, he was transported from HCCF to SCCF the day of his discharge. (*Id*. ¶¶ 6-7). Delk states that while he was being transported, he "hit [his] face multiple times in the van" breaking the stiches in his jaw and leaving an open wound inside his mouth. (Delk Dep., Doc. No. 113-3 at 146:15-16, 153:24-25).

Tresea Petty and Thelma Bumphus are registered nurses who were on duty at various times while Delk was in the emergency room and infirmary at SCCF. Jasper Brewser worked as

a dentist at SCCF four days a week, Tuesday through Friday. (Brewster Dep., Doc. No. 111-9 at 8; Brewster Decl., Doc. No. 111-1 ¶ 3). Although the medical records reflect they were not the only medical providers responsible for Delk's care, they are the only medical providers who are defendants in this case. Accordingly, the following facts focus on care provided by these defendants.

Delk arrived at SCCF on March 11, 2016, at 1:00 a.m., when Petty was on duty. (SOF ¶ 17). Bumphus, who worked night shift three nights a week, was not present when Delk arrived, but was on duty later that evening. (SOF ¶ 9; Bumphus Dep., Doc. No. 111-11 at 45; Doc. No. 111-4 at PageID# 1045 (showing notations by Bumphus on March 11, 2016, at 8:00 p.m.)). Petty discovered that Delk's medical chart had not been transported with him and called HCCF to ask about Delk's medical history and condition. (SOF ¶¶ 18, 19). As a result of the call, Petty noted the following prescriptions in Delk's medical chart: (1) Celexa; (2) Buspar; (3) Perigard mouthwash; (4) Lortab Elixir; (5) Medrol dose pack; and (6) Clindamycin. (*Id.*). Petty stated that the wire cutters were secured in the medical administration record ("MAR") binder in the SCCF pharmacy which was in the same area as the emergency room where Delk was staying when he arrived.[2] (Petty Dep., Doc. No. 111-10 at 33-34, 41; SOF ¶ 23).

Upon his arrival at SCCF, Delk told Petty and Bumphus about hitting his face against the van while he was being transported. (Delk Dep., Doc. No. 114-3 at 140, 150). He told them that he felt a "tooth" hanging inside his jaw from where he hit his face and "busted open the surgery." (*Id.*).

---

[2] Defendant contends the location of the wire cutters is disputed because Bumphus testified that the wire cutters were in the sharps cabinet. (SOF ¶ 21 (citing Bumphus Dep. 41:12-13)). However, the citation does not reflect this testimony, and there does not appear to be any dispute that the wire cutters were kept in the pharmacy. (*See* Pl. Resp., Doc. No. 113 at 19 (stating that Bumphus testified nurses could transport the wire cutters from the pharmacy to the infirmary in less than a minute)).

3

Not long after he arrived at SCCF on the morning of March 11, 2016, Delk was transported by ambulance to Wayne County Medical Center ("Wayne County Medical") because he was suffering from diarrhea, nausea, and vomiting. (SOF ¶ 24; Doc. No. 114-1). Wayne County Medical determined the diarrhea was a reaction to the clindamycin and ordered Delk to restart clindamycin, be given a full liquid diet, and to have wire cutters "available to cut arch bars in case of vomiting." (Doc. No. 111-3 at PageID# 988). The records note that Delk was scheduled for a follow-up on March 21, 2016, with the ear, nose and throat physician, and that the ophthalmologist felt Delk did not require treatment "at this time." (*Id*. at PageID# 993). At this point Delk was unable to talk, but could communicate by writing notes. (Petty Dep., Doc. No. 114-5 at 29; Doc. No. 111-3 at PageID# 988-1004, Doc. No. 114-1). The records do not indicate Wayne County Medical noticed or that Delk complained of any injury sustained during his transport to SCCF. Once Delk returned to SCCF, a nurse practitioner prescribed Boost, clindamycin, and Tylenol, and ordered that wire cutters be "available for vomiting." (Brewster Decl., Doc. No. 111-1 ¶ 8; Doc. No. 111-3 at PageID# 979-1004).

During her shifts, Bumphus observed Delk at least once every two hours. (SOF ¶ 38). The night of March 11, 2016, Bumphus examined Delk several times and provided him medication.[3] (SOF ¶¶ 28-30). The following morning, March 12, 2016, Delk complained that his face was swelling and throat tightening up. (SOF ¶ 31). Due to Delk's complaint, and her observation of a small amount of blood in the suctioning container, Bumphus referred Delk to a nurse practitioner. (*Id*. ¶¶ 31-32). The nurse practitioner prescribed Benadryl. (*Id*. ¶ 33). About an hour later, Delk reported that he was feeling better. (*Id*. ¶ 34).

---

[3]  As discussed further below, the parties dispute whether Delk was provided all of his medication, specifically whether he was provided prescription mouthwash (chlorohexidine gluconate).

4

On March 14, 2016, at 2:00 p.m., Delk was transferred from the emergency room to a cell in the infirmary. (SOF ¶ 36). His infirmary cell was in a secured hallway "not very far" from the pharmacy. (Petty Dep., Doc. No. 111-10 at 34). Two secured doors separated the unsecured area which contained the pharmacy, nurses station, and ER, and the secured hallway with the infirmary cells. (Petty Dep., Doc. No. 114-5 at 41). To access the secured area, a correctional officer had to open the doors with a key. (*Id*.). Bumphus testified that nurses could transport the wire cutters from the pharmacy to Delk's cell in the infirmary in under a minute if needed. (*See* Doc. No. 113 at 19 (citing Bumphus Dep., Doc. No. 113-7 at 33:9-12)).

The medical record indicates that Delk refused his medication that evening. (Bumphus Decl., Doc. No. 111-7 ¶ 7; Doc. No. 111-7 at PageID# 1150). The medical record does not state which specific medications were offered and refused. For the next few days, Petty and Bumphus observed Delk, noted his wiring was intact, instructed him to continue self-suctioning, and noted his complaint that he needed more food, which resulted in an order for Boost three times a day. (SOF ¶¶ 41-46).

On Friday, March 18, 2016, at 7:00 p.m., Delk told Petty that he had a loose tooth. (*Id*. ¶ 47). This is the first mention in the medical records of Delk's complaint about a loose tooth. However, Delk claims from the time he arrived at SCCF he repeatedly complained to Petty and Bumphus that he hit his face against the van while he was being transported and that he felt a "tooth" hanging inside his jaw and that it was painful. (Delk Dep., Doc. No. 114-3, at 140, 150). He says Petty and Bumphus "just disregarded" his complaints. (*Id*.). In response to his complaint about a loose tooth on March 18, 2016, Petty told him that on Monday he should notify a nurse that he needed to see a dentist. (*Id*.). She also noted that Delk was requesting more Boost and

5

Case 1:19-cv-00081   Document 122   Filed 09/13/22   Page 5 of 20 PageID #: 1412

ibuprofen than ordered. (*Id*. ¶ 48; Doc. No. 111-5 at PageID# 1038). She told him she could not give him more than what was ordered. (*Id*.).

Delk's follow-up visit with the ENT specialists and opthamology, which Regional One ordered for March 21, 2016, was delayed to March 28, 2016. (SOF ¶ 55). At the appointment, Delk told the medical provider that he hit his face in the ambulance when being transported "back to jail." (Doc. No. 114-2 at PageID# 1344). The providers at Regional One discovered that Delk had an open wound inside his mouth that required surgical repair under local anesthesia. (*Id*.; Delk Dep., Doc. No. 113-3 at 153). In addition to the surgical repair, the medical providers removed the wires and replaced them with rubber bands. (SOF ¶ 58). They also prescribed mouthwash (chlorohexidine gluconate) to be used five times per day after meals. (Doc. No. 114-2 at PageID# 1346). After the appointment, Delk was transported back to SCCF where he returned to his cell in the infirmary. (SOF ¶ 60).

On Monday, April 4, 2022, at approximately 8:00 p.m., Delk told Bumphus that he thought the rubber bands in his mouth were breaking. (SOF ¶ 66). He requested his mouth be checked. (*Id*). Bumphus referred him to dental that day and the following morning he was examined by Brewster. (*Id*. ¶¶ 67, 68). Brewster observed that only two rubber bands remained – one on each side. (*Id*. ¶ 70; Doc. No. 111-2 at PageID# 921). Because the dentistry clinic was for general dentistry, Brewster did not have replacement rubber bands available. (Brewster Dep., Doc. No. 111-9 at 16). In fact, Brewster stated that he had never had a patient that needed bands before. (*Id*. at 18). He increased Delk's prescription for ibuprofen and noted that a "follow-up app[ointment] has already been made to see [the] oral surgeon + ophthalmologist." (Doc. No. 111-2 at PageID# 921).

Delk had a follow-up appointment with the specialists at Regional One on April 18, 2016. (SOF ¶¶ 83, 89; Brewster Dep., Doc. No. 111-9 at 40). His rubber bands were not replaced until then. (*Id*.). According to the medical records, the examination showed that Delk "appear[ed] to have good contact of his molars," there was no mandibular swelling, the arch bars remained intact, and there were "two 'pinpoint' areas of dehiscence with no pus." (SOF ¶¶ 84, 85). The medical records state that the providers "discussed with the patient the Panorex results they are in good reduction position." (Doc. No. 111-2 at PageID# 955). The records also show a recommendation that the Panorex results be reviewed and interpreted. (*Id*.). Medical providers at Regional One renewed his prescription for mouthwash. (*Id*. ¶ 90). At the conclusion of the appointment, Delk was transported back to SCCF.

The morning of April 19, 2016, Bumphus notified the day nurse of the paperwork from Delk's appointment at Regional One, and that the paperwork was to be reviewed by the provider. (Doc. No. 111-4 at PageID# 1023). Thereafter, a nurse called Brewster to ask him to order the prescription mouthwash ordered by Regional One. (SOF ¶ 97; Doc. No. 111-2 at PageID# 930). Brewster ordered prescription mouthwash to be used three times a day after meals. (*Id*.). That evening, Bumphus examined Delk. (SOF ¶ 98). He was not in any acute distress and told Bumphus, "I don't want any medicine, just the Boost." (Bumphus Decl., ¶ 24; Doc. No. 111-4 at PageID# 1023).

On April 20, 2016, Petty realized Delk had been given mouthwash to be kept on his person. (SOF ¶ 102). Because the mouthwash contained alcohol which is prohibited to be kept by inmates, Petty took it away and informed Delk that the mouthwash would be administered as ordered by Brewster. (*Id*. ¶ 103).

On April 21, 2016, Delk complained to Brewster that his rubber bands were broken. (SOF ¶ 106). Brewster replaced the broken bands, administered mouthwash, and applied wax to some sharp areas of wire in Delk's mouth. (*Id*. ¶ 107). Three days later, Delk complained that his prescription mouthwash was breaking his rubber bands. (*Id*. ¶ 111).

On April 25, 2016, Delk asked Bumphus to notify a doctor about swelling in his left jaw and Bumphus notified the nurse practitioner. (*Id*. ¶¶ 112-13). At that time, his rubber bands were in place. (*Id*. ¶ 114). The next day, after Delk informed a nurse that his rubber bands were broken, Brewster spoke with Delk and told him he would replace the bands that afternoon. (*Id*. ¶ 117). When Brewster sent for Delk to replace the rubber bands, Delk refused to go because he wanted to eat dinner. (*Id*. ¶¶ 118, 119). Delk went to Brewster's office the following day, April 27, 2016, and Brewster replaced the rubber bands. (*Id*. ¶¶ 123-125). Brewster observed a slight infection in Delk's lower right jaw, which he attributed to the metal wires cutting Delk's mouth. (*Id*. ¶¶ 126-27; Brewster Dep., Doc. No. 111-9 at 52-53). Brewster applied wax on the sharp areas of wire to prevent irritation and prescribed an antibiotic to treat the infection. (SOF ¶¶ 125, 128).

There is no record of problems with the rubber bands between April 27 and May 12, 2016. On May 13, 2016, Petty observed there were no rubber bands in Delk's mouth, but the wires remained intact. (*Id*. ¶ 139). Three days later, Delk was again transported to Regional One for a follow-up appointment. (*Id*. ¶ 141). The records note that there had been multiple changes of rubber bands due to multiple broken bands, that the panorex x-ray revealed "good reduction," and that he "may not be in premorbid occlusion, however class I anteriorly, right posterior molar is slightly medial in placement." (Doc. No. 111-5 at PageID# 1095). The records state that the

arch bar would be removed on May 19, 2016, and that Delk should follow-up in one month. (*Id.*).

After the appointment, Delk was returned to SCCF and released from the infirmary. (SOF ¶¶ 146-47). The arch bar was removed on May 19, 2016. (*Id.* ¶ 149). The following day, Dr. Coble ordered a refill of prescription mouthwash to be used twice a day until empty. (*Id.* ¶ 150). Delk returned to HCCF on June 2, 2016, and was no longer treated by the Defendants. (*Id.* ¶ 151).

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere

scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers* 344 F.3d at 595.

## IV. ANALYSIS

"Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (citing 42 U.S.C. § 1983). "It is well settled that private medical professionals who provide healthcare to inmates at a county jail qualify as government officials acting under color of state law for purposes of section 1983." *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018). Defendants do not dispute that they were acting under color of state law for purposes of section 1983.

Delk claims Bumphus, Petty, and Brewster were deliberately indifferent to his serious medical needs, which is a violation of the Eighth Amendment's prohibition on cruel and unusual punishment. *See North v. Cuyahoga Cty.*, 754 F. App'x 380, 384-85 (6th Cir. 2018); *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994). Deliberate indifference has both objective and subjective components, requiring "proof that the inmate had a sufficiently serious medical need and that a municipal actor knew of and disregarded an excessive risk to the inmate's health or safety." *North*, 754 F. App'x at 385.

### A. Objective Component

The objective component "requires that the inmate have a sufficiently serious medical need such that [he or she] is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citing *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008)). A "sufficiently serious medical need" is one that has been "diagnosed by a physician as mandating

10

Case 1:19-cv-00081   Document 122   Filed 09/13/22   Page 10 of 20 PageID #: 1417

treatment or … is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id*. (quoting *Jones v. Muskegon Cty*., 625 F.3d 935, 941 (6th Cir. 2010)); *Gunther v. Castineta*, 561 F. App'x 497, 499-500 (6th Cir. 2014) (need for medical care is "obvious" when "the average person would easily recognize … that the plaintiff's condition needed treatment"). When the need for medical care is "obvious," an inmate need not present verifying medical evidence to show that a delay in treatment or lack of treatment caused his medical condition to worsen or deteriorate. *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 899-900 (6th Cir. 2004). "The obviousness standard refers to a doctor's attention, and thus is primarily applicable to claims of denial or delay of *any* medical treatment rather than claims that a plaintiff was denied or delayed in receiving a *specific type* of medical treatment." *Blosser v. Gilbert*, 422 F. App'x 453, 460 (6th Cir. 2011) (emphasis in original).

However, if a medical need would not be obvious to a lay person, or if an inmate received some treatment but is complaining of the adequacy of treatment or of a delay in treatment, the inmate "must place verifying medical evidence in the record to establish the detrimental effect of the delay or inadequacy of medical treatment." *Blosser*, 422 F. App'x at 460 (quoting *Blackmore*, 360 F.3d at 897); *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018); *King v. Alexander*, 574 F. App'x 603 (6th Cir. 2014); *Santiago v. Ringle*, 734 F.3d 585 (6th Cir. 2013).

Defendants do not dispute the seriousness of Delk's underlying medical condition. They argue, however, that because Delk received treatment for his condition and his complaint is about the adequacy or delay of medical care, he must place "verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment" or "medical proof that the provided treatment was not an adequate treatment of [his] condition or pain" to establish

11

the objective component of a deliberate indifference claim. (Doc. No. 110 at 11-13 (quoting *King*, 574 F. App'x at 605, and *Rhinehart*, 894 F.3d at 737)). They argue that he has not provided any such evidence and that his claim must fail on that basis.

Plaintiff argues that he is not required to submit verifying medical evidence because the injuries he sustained when he was attacked by inmates at HCCF "easily meet the objective test" for "serious medical need" because the need for care for his broken face was "obvious."[4] (Doc. No. 113 at 11-12, 24). Plaintiff acknowledges that he received treatment for the injuries to his face and that he is challenging the adequacy of the treatment. (Doc. No. 113 at 24 ("Mr. Delk came to the facility with known serious medical needs and injuries that were improperly treated.")). Plaintiff suggests that even if he did receive some treatment for his injuries, the "cursory care" provided "amounted to no treatment at all" and verifying medical evidence is, therefore, not required. (Doc. No. 113 at 25). Delk argues that even if such evidence were required, he has presented evidence through the expert report of Dr. Michael McMunn that the "nursing care [and provider] failures … contributed to Mr. Delk's unnecessary anxiety, pain and suffering secondary to his documented serious need." (Doc. No. 113 at 24 (citing Doc. No. 105)).

If verifying medical evidence is required, it cannot come from the expert report of Dr. McMunn because that report is not in evidence. Although Plaintiff filed Dr. McMunn's report before Defendant moved for summary judgment (Doc. Nos. 105, 106-1), the Court ordered a number of filings, including expert disclosures and reports and notices of deposition, stricken

---

[4] A large number of Plaintiff's citations are to the Amended Complaint (Doc. No. 63). Although a properly verified complaint has the same force and effect as a properly executed affidavit and may constitute admissible evidence in response to a motion for summary judgment, *see Meeks v. Schofield*, 625 F. App'x 697, 701 (6th Cir. 2015), the Amended Complaint in this case is not a verified complaint and, therefore, cannot serve as evidence in support of Plaintiff's claims.

12

from the record. (*See* Aug. 20, 2021 Order, Doc. No. 107 (striking Doc. Nos. 85, 86, 87, 95, 96, 97, 98, 99, 100, 102, 104, 106)). The Court instructed the parties that they may refile the documents for a proper purpose such as in connection with a motion for summary judgment. Plaintiff did not refile Dr. McMunn's report.[5]

The Court will turn to whether Delk has satisfied the objective component of his claim with regard to each of the alleged deficiencies in care: (1) failure to administer prescription mouthwash; (2) failure to promptly replace rubber bands in his mouth; (3) failure to treat him for injury incurred during transport; and (4) failure to have wire cutters nearby.

1. Prescription Mouthwash

It is undisputed that medical providers ordered that Delk be given prescription mouthwash (chlorohexidine gluconate). (*See* Petty Dep., Doc. No. 111-10 at 29-30; Doc. No. 111-2 at PageID# 954; Doc. No. 111-3 at PageID# 975; Brewster Decl., Doc. No. 111-1 ¶¶ 4, 13). The purpose of the mouthwash is to help prevent infection. (Brewster Dep., Doc. No. 111-9 at 47). Those orders notwithstanding, Plaintiff claims Defendants never administered the prescription mouthwash. (Delk Dep., Doc. No. 111-3 at 156:23 ("They never brought me my mouthwash.")). Medical administration is normally reflected on the Medical Administration Record ("MAR"), which is part of the inmate's medical chart. (SOF ¶ 155). But some of the MARs that would have been created during Delk's incarceration at SCCF are inexplicably missing from Delk's medical chart. (Petty Decl., Doc. No. 111-6 ¶ 20; Bumphus Dep., Doc. No. 111-11 at 69). Therefore, although Petty and Bumphus both stated that they always administered medication to Delk as prescribed unless he refused to take the medications, the medical records

---

[5] Plaintiff filed a single page of the deposition testimony of Dr. McMunn. (Doc. Nos. 113-6 and 114-6). This testimony does not concern the effects of the treatment Delk received.

13

only show that Delk was given the mouthwash a handful of times. (Petty Decl., Doc. No. 111-6 ¶ 20; Bumphus Dep., Doc. No. 111-11 at 69-70).

Delk claims Defendants failed to administer the prescription mouthwash as ordered and in doing so deliberately disregarded a serious risk to his health and safety. The mouthwash prescription was part of an overall course of treatment caring for the severe facial injuries Delk sustained during the attack at HCCF. Delk's argument that the care he received was so cursory as to amount to no treatment at all is not supported by the lengthy medical record detailing the treatment provided. (*See* Doc. Nos. 111-2, 111-3, 111-4, 111-5 (totaling almost 200 pages of medical records detailing extensive treatment)). Because Plaintiff was receiving medical care for his injuries, he must provide verifying medical evidence that the failure to administer mouthwash as prescribed caused a detrimental effect. *See Blosser*, 422 F. App'x at 460. He has not done so. Although Plaintiff claims that the treatment deficiencies cause him unnecessary pain and anxiety, there is no medical evidence to suggest that the pain associated with his severely injured face would have been avoided if he had been provided mouthwash. Nor is there medical evidence to show the slight infection Brewster noticed on April 27, 2016, and treated with antibiotics would not have developed if Delk had been administered mouthwash as ordered. Indeed, Brewster attributed the infection to the metal wires cutting into Delk's mouth, not to a lack of mouthwash. (SOF ¶¶ 125-28; Brewster Dep., Doc. No. 111-9 at 52-53).

Without verifying medical evidence to show that the failure to administer prescription mouthwash as ordered, Plaintiff has failed to establish the objective component of his claim as to the alleged deficiencies in care related to mouthwash and summary judgment will be granted in favor of Defendants as to this portion of Plaintiff's claim.

2. Rubber Bands

Delk's claim of deficient care regarding the timely replacement of rubber bands concerns the time between April 5, 2016, when Brewster noted that Delk had only two rubber bands remaining in his mouth, and April 18, 2016, when the rubber bands were replaced at Regional One. Delk also cites an occasion on May 13, 2016, when Petty noticed the rubber bands were broken, but did not refer him to the dentist. (Doc. No. 113 at 21 (citing Petty Dep., Doc. No. 110-11 at 56, 69)).[6] Delk visited Regional One for a follow-up appointment three days later on May 16, 2016, and his arch bar was removed on May 19, 2016. (SOF ¶¶ 141-146, 149).

Because Delk's claim related to the delay in replacing his rubber bands is a complaint about a delay in treatment, not the failure to provide any treatment, as with his claim relating to the mouthwash, he must place verifying medical evidence in the record to establish the detrimental effect of the delay.[7] *Blosser*, 422 F. App'x at 460. Delk contends the delay in replacing his rubber bands prevented his jaw from being properly aligned when it healed and that in failing to promptly replace the rubber bands Defendants disregard a serious risk that he would not heal properly without the rubber bands in place. (Doc. No. 113 at 20-21).

Though there is some evidence in the medical record that his teeth were not perfectly aligned, the medical records do not suggest that any misalignment was due to the delay in replacing the rubber bands or other deficiencies in treatment; nor is there evidence suggesting

---

[6] The Amended Complaint claims Plaintiff's rubber bands were also not replaced between April 21, 2016 and April 27, 2016. (*See* Doc. No. 63 ¶¶ 22, 29). Not only is the Amended Complaint not admissible evidence, *see supra* note 4, this allegation is at odds with the undisputed evidence which shows Brewster replaced Delk's rubber bands on April 21, 2016 and that the rubber bands were in place on April 25, 2016. (*See* SOF ¶¶ 107, 114).

[7] Defendants note that Plaintiff's expert, Michael McMunn, admits that an oral surgeon is needed to opine on any alleged injuries suffered as a result in the delay in replacing rubber bands. (Doc. No. 110 (citing McMunn Dep. at 149:10-15)). This testimony is not in the record. Defendants did not file any of Michael McMunn's deposition testimony in support of the motion for summary judgment, and Plaintiff filed only a single page, which is not the portion cited by Defendants.

15

that the pain associated with his severely injured face would have been reduced if his rubber bands had been replaced without delay. Accordingly, Plaintiff has failed to establish the objective component of his claim as to the alleged deficiencies in care related to replacement of rubber bands and summary judgment will be granted in favor of Defendants as to these portions of Plaintiff's claim.

      3. <u>Injuries Sustained During Transport</u>

Plaintiff's ability to establish the objective component of his claim that Bumphus and Petty failed to provide any care for the injuries he allegedly sustained during transport to SCCF fares differently. Unlike the claims related to the care for the injuries to his face that were sustained at HCCF for which he received treatment, Plaintiff alleges he suffered new injuries during transport that caused his stitches to break and his wound to open. He alleges he did not receive any care or examination of these new injuries. His complaint that he hit his already injured face on the inside of the transport van and felt a tooth hanging inside his jaw that was wired shut is the sort of "obvious" injury that the average person would recognize required treatment or at least further examination. Plaintiff need not provide verifying medical evidence for this aspect of his claim. Even if such evidence was required, Plaintiff's medical records show that his stitches had in fact opened and that he required surgery to close the wound. If the stitches opened during transport to SCCF, Plaintiff waited approximately three weeks without treatment for the open wound in his mouth. The Court finds evidence from which to conclude Plaintiff has established the objective element of claim related to treatment of his subsequent injury.

The remaining aspect of Plaintiff's claim is that Bumphus and Petty failed to keep wire cutters "nearby." As discussed below, the Court finds that Delk cannot satisfy the subjective

16

component of his claim related to the availability of the wire cutters and, therefore need not determine whether he has established the objective component of this aspect of his claim.

**B. Subjective Component**

The subjective component of a deliberate indifference claim requires that officials had a "sufficiently culpable state of mind" of "deliberate indifference to inmate health or safety." *Id*. (quoting *Farmer*, 511 U.S. at 834). Deliberate indifference requires more than negligence, something akin to reckless disregard; but it does not require proof that the officials intended to cause harm. *Id*. The plaintiff must "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Id*. "The subjective component is designed 'to prevent the constitutionalization of medical malpractice claims.'" *Winkler v. Madison Cty.*, 893 F.3d 877, 891 (6th Cir. 2018) (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)). To show deliberate indifference, a plaintiff must allege "more than negligence or the misdiagnosis of an ailment." *Id*. (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id*. "Where medical care is merely inadequate, this Court is 'generally reluctant to second guess medical judgments.'" *Richmond v. Huq*, 885 F.3d 928, 939 (6th Cir. 2018) (quoting *Alspaugh v. McConnell*, 537 F.3d 162, 169 (6th Cir. 2011)). However, "[f]ailure by medical staff to adhere to a prescribed course of treatment may satisfy the subjective component of an Eighth Amendment violation." *Richmond v. Huq*, 885 F.3d 928, 939 (6th Cir. 2018) (citing *Estelle*, 429

U.S. at 105 ("interruption of a prescribed plan of treatment could constitute a constitutional violation")).

1. <u>Injuries Sustained During Transport</u>

Defendants argue Delk cannot show that Bumphus and Petty were deliberately indifferent to any alleged injury suffered by Plaintiff during his initial transport to SCCF because Petty examined Delk upon his arrival and "provided immediate suctioning for his wired mouth" and transported Delk to an outside medical provider within hours of his arrival at SCCF. (Doc. No. 110 at 16). Defendants contend that providing Delk access to outside medical care shows that they were not deliberately disregarding his "medical condition and need for care – whatever medical condition Plaintiff claims he was suffering from at the time." (*Id*.).

Delk notes that he was referred to an outside medical provider shortly after arriving at SFFC, not for care for alleged additional injuries he sustained during transport, but because he had diarrhea and there was concern he may have been vomiting blood. (Doc. No. 113 at 15; Doc. No. 111-3 at PageID# 993, 1003). He argues this treatment should not be considered treatment or examination related to his complaints of additional injury during transport to SCCF.

There is no evidence that Defendants referred Delk to a medical provider to check for additional injuries sustained during transport or to investigate his claim of a hanging tooth. Under these circumstances, a reasonable jury could find that Bumphus and / or Petty were aware of facts from which to infer there was a substantial risk that Delk would undergo unnecessary pain and suffering if left untreated, and nevertheless failed to seek treatment or evaluation of his claimed injury. Accordingly, Defendants' motion for summary judgment will be denied as to this aspect of Delk's claim.

18

Case 1:19-cv-00081   Document 122   Filed 09/13/22   Page 18 of 20 PageID #: 1425

2. Wire Cutters

Plaintiff contends Defendants knew that wire cutters were to be in his "immediate vicinity," and that by placing the wire cutters in the pharmacy rather than some closer location, they deliberately disregarded an excessive risk to his health and safety.[8] (Doc. No. 113 at 12-13). Plaintiff's discharge instructions from Regional One on March 10, 2016, stated that Delk "should have wire-cutters within immediate distance in case of emergency." (Doc. No. 111-5 at PageID# 1082). The discharge instructions from Wayne County Medical Center the following day instructed, "Have wire cutters available to cut arch bars in case of vomiting." (Doc. No. 111-3 at PageID# 988). There is no assertion that Delk needed wire cutters while he was at SCCF, only that the failure to keep the wire cutters close enough placed him at as substantial risk of harm.

Defendants argue that placing the wire cutters in the MAR binder in the pharmacy where they could be accessed quickly if needed was not deliberately indifferent to a substantial risk of harm. The Court agrees. Importantly, the parties agree that, due to safety concerns in the correctional setting, Delk could not personally possess wire cutters. (SOF ¶ 20). Given these concerns, the wire cutters were placed in the MAR binder in the pharmacy, which was in the same area as the emergency room and down the hall from the infirmary. (Petty Dep., Doc. No. 111-10 at 34 (stating that the pharmacy was "just down the hall, not very far" from where Delk was located while he was in the infirmary)). True, the infirmary hallway was behind locked doors that required opening by a correctional officer with a key, but there is no evidence to

---

[8] Plaintiff contends the location of the wire cutters is disputed because Bumphus testified that the wire cutters were kept in the sharps cabinet. (SOF ¶ 21 (citing Bumphus Dep. 41:12-13)). The citation does not reflect this testimony. Plaintiff filed two excerpts from Bumphus' deposition testimony. (Doc. No. 114-7 (7 pages); 113-7 (3 pages)). None of the excerpts include testimony regarding the specific location of the wire cutters. However, there does not appear to be any dispute that the wire cutters were kept in the pharmacy. (*See* Pl. Resp., Doc. No. 113 at 19 (stating that Bumphus testified nurses could transport the wire cutters from the pharmacy to the infirmary in less than a minute); *see also*, Petty Dep., Doc. No. 111-10 at 33-34 (stating that the wire cutters were kept in the MAR binder in the pharmacy)).

suggest the nurses thought the locked door would prevent them from responded to Delk's needs in a timely manner. In fact, Bumphus testified that nurses could transport the wire cutters from the pharmacy to Delk's cell in the infirmary in under a minute if needed. (*See* Doc. No. 113 at 19 (citing Bumphus Dep., Doc. No. 113-7 at 33:9-12)). There is no indication that Defendants were aware that failure to keep the wire cutters at a location closer to Plaintiff than the pharmacy presented a risk of substantial harm. On this record, there is no basis to infer that Defendants deliberately disregarded a substantial risk of harm by placing the wire cutters in the pharmacy. Therefore, judgment will enter in favor of Defendants on the portion of Plaintiff's claim related to the location of the wire cutters.

## V. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Doc. No. 109) will be granted as to the claims arising out of the failure to administer prescription mouthwash, the failure to replace rubber bands, and the location of the wire cutters. The Motion will be denied as to the claims relating to the failure to provide treatment for injuries allegedly sustained during transport. Because the surviving claim does not concern Dr. Brewster, the claims against Brewster will be dismissed with prejudice.

An appropriate order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE